[Civ. No. 17538. First Dist., Div. One. Jan. 17, 1958.]

ALLSTATE INSURANCE COMPANY (a Corporation), Appellant, v. CATHERINE VERNITA ROBERTS et al., Respondents.

*Assigned by Chairman of Judicial Council.

Leo J. Walcom for Appellant.

Francis T. Cornish and Smith & Parrish for Respondents.

WOOD (Fred B.), J.—Plaintiff brought this action against defendants Raymond and Catherine Roberts to determine its obligations, if any, under a policy of public liability insurance it had issued to Raymond; i.e., with reference particularly to coverage of Raymond's liability toward persons injured in an accident which occurred while he was driving his wife Catherine's Ford instead of his own car, a Mercury specified in the policy as the "owned automobile."

By the terms of the policy plaintiff agreed to pay for

damages which Raymond should be legally obligated to pay because of injury to person or property "arising out of the ownership, maintenance or use, including loading and unloading, of the owned automobile, a substitute automobile or a non-owned automobile," and to defend any suit for such damages and to pay costs in any such suit and certain medical expenses.

The policy defined "substitute automobile" as meaning "an automobile not owned by the named insured but temporarily used as the substitute for the owned automobile while withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

The trial court found that Catherine's Ford was at the time of the accident being used by Raymond as a "substitute automobile," as defined in the policy.

Plaintiff appeals from the judgment in Raymond's favor and poses two questions: (1) Was the Mercury withdrawn from its "normal use"? (2) Was the Mercury withdrawn from normal use "because of its breakdown"?

Raymond used the Mercury in going to and from his place of work in Oakland and elsewhere in the vicinity. Catherine did not use it at any time after she acquired the Ford in early November, 1953.

For some time prior to the accident (March 8, 1954) the Mercury was not running properly. The brakes were repaired in January, 1954, at a cost of $84. A new overdrive was installed in February at a charge of $93. And still the car did not function well. Raymond thought the trouble might be with the new overdrive. He took the Mercury back to the repair place for a check-up and the report was that the trouble was with something other than the overdrive. When driven slowly (20 to 30 miles per hour) it would seem to be all right but at a higher speed, when trying to pass a car, the motor would cut out. He considered that a hazard and felt that he should not have driven it to the extent that he did.

During the week prior to the accident he drove the Ford twice. The weather was bad and his Mercury was acting up so he borrowed Catherine's car to be sure he would get to work.

On Saturday, March 6, 1954, Mr. and Mrs. Camp (Catherine's brother and sister-in-law) asked Raymond if he would take Mrs. Camp to her home in Grass Valley on the following Monday, Raymond's day off. He declined because his car

was not running right. They then suggested he borrow Catherine's car. The next day he obtained her consent to use it for that purpose. On the 8th he drove out to where she was staying, left his Mercury there, took the Ford and started on the trip to Grass Valley. Near Lodi the collision occurred.

He left the Mercury in the driveway and the keys with Catherine. She had the car locked. It stood in the driveway until March 17, 1954, when it was taken by her brother to a garage for further repairs. The Mercury was not driven during any of that time.

This evidence supports the trial court's findings in Raymond's favor. We are not prepared to say that taking a friend or relative from Oakland to her home in Grass Valley is not a "normal use" of a passenger car when it is in good working condition. Nor can we say as a matter of law that that term changes its meaning when the car gets into such a state of disrepair that it becomes imprudent for the owner to use it on such a trip, especially an owner who exerted the efforts this owner did to restore his car to normal capacity.

Nor can we say as a matter of law that the Mercury was not "withdrawn" from normal use because of its "breakdown." There it stood in the driveway, locked and unused during the period of the use of the "substitute" Ford and until taken to a garage for further repair.

We concur in the views expressed in an opinion filed by Honorable Richard H. Chamberlain who presided at the trial of this case: "Was the Ford car being 'temporarily used' as a substitute for the Mercury car specified in the policy and was the Mercury 'withdrawn from normal service because of its breakdown'?

■ "The provision for coverage of a substituted vehicle 'is for the insured's benefit' and is to be 'construed liberally in favor of the insured, if any construction is necessary.' (*Farley* v. *American Auto. Ins. Co.* (1952), 137 W.Va. 455 [72 S.E.2d 520, 521, 34 A.L.R.2d 933].) ■ And the purpose of a substitution clause is not to narrowly limit or defeat coverage, but to make the coverage reasonably definite as to the vehicle the insured intended normally to use, while at the same time permitting him to continue driving should the particular vehicle named be temporarily out of commission, thus enabling the insurer to issue a policy upon a rate fair to both insured and insurer, rather than one at a prohibitive premium for blanket coverage of any and all vehicles which the insured might own or operate.

"In support of its position that the Ford was not covered by the policy plaintiff cites *Erickson* v. *Genisot* (1948), 322 Mich. 303 [33 N.W.2d 803], and *Western Casualty & Surety Co.* v. *Norman* (1952), 197 F.2d 67. In the Erickson case the insured was using a Plymouth car (not specified in the policy) 'in the interests of his business,' instead of a truck (specified in the policy) which was in poor mechanical condition, and there was no testimony that on the date of the accident the truck was not being used. In the Western Casualty case a partner was driving his own Oldsmobile (not specified in the policy) on partnership business instead of one of the partnership's Fords (specified in the policy), and the evidence showed that the partner had previously driven his Oldsmobile, using the firm's gasoline, making business calls for the firm; 'the breakdown of the Ford was only coincidental.'*

"The cases of *Fleckenstein* v. *Citizens Mutual Auto Ins. Co.* (1950), 326 Mich. 591 [40 N.W.2d 733], and the *American Employers Ins. Co.* v. *Maryland Casualty Co.* (1954), 218 F.2d 335, are in the Court's opinion more nearly in point. In the American Employers Ins. Co. case, particularly, although the insured occasionally—but not regularly—used his wife's Ford, the trial court and the appellate court found sufficient evidence to sustain a finding that the Ford was being used as a 'temporary substitute automobile' at the time of the accident.

"Notwithstanding the admittedly false and inconsistent statements made by both defendants to investigators after the accident, the evidence persuades the Court that the Ford car was being used only 'temporarily' and that on the date of the accident the Mercury here was 'withdrawn from normal service because of its breakdown.' "

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

---

*The following additional cases cited by plaintiff upon this appeal are also inapplicable for various reasons:

*Pennsylvania Casualty Co.* v. *Suburban Service Bus Co.* (Mo.App. 1948), 211 S.W.2d 524, the named vehicle continued in use; *Service Mutual Ins. Co.* v. *Chambers* (Tex.Civ.App. 1956), 289 S.W.2d 949, the named vehicle continued in use; *State Farm Mut. Automobile Ins. Co.* v. *Bass* (1951), 192 Tenn. 558 [241 S.W.2d 568], the named tractor and trailer constituted one vehicle, hence no coverage when the tractor was towing a different, a borrowed trailer; *Iowa Mutual Ins. Co.* v. *Addy* (1955), 132 Colo. 202 [286 P.2d 622], not a case of "breakdown" when substitution was made merely because the named vehicle was low on gasoline and had heavy snow chains on its tires.